890 A.2d 737

**Elmer DENNIS, et al.**

v.

**FIRE & POLICE EMPLOYEES' RETIREMENT SYSTEM, et al.**

**No. 27, Sept. Term, 2005.**

Court of Appeals of Maryland.

Jan. 18, 2006.

**640**

Michael Marshall (Schlachman, Belasky & Weiner, P.A., on brief) of Baltimore, for petitioners.

Wendy Widmann (Daneker, McIntire, Schumm, Prince, Goldstein, Manning & Widmann, P.C., Abraham M. Schwartz on brief) of Baltimore, for respondents.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

RAKER, J.

Appellants, both former Baltimore City police officers, ask this Court to determine whether payments of deferred retirement option plan ("DROP") retirement benefits from the Baltimore City Fire and Police Employees' Retirement System ("the Retirement System") are "pension" payments within the meaning of the Qualified Domestic Relations Orders ("QDROs") entered in appellants' divorces, entitling the appellee spouses to a portion of the DROP payments in accordance with the terms of the QDROs. We shall hold that the DROP payments are "pension" payments under the QDROs, and that consequently the appellee spouses are entitled to their shares of the DROP payments under the QDROs.

## I.

Appellants, Elmer Dennis and Edmund Lubinski, are retired Baltimore City police officers. Appellees Catherine Dennis and Edna Sullivan are the former spouses of Elmer Dennis

and Edmund Lubinski, respectively. The Retirement System and the Mayor and City Council of Baltimore are also appellees in this action.

Lubinski and Sullivan were divorced by a Judgment of Absolute Divorce entered on February 22, 1990. The judgment was entered in accordance with an agreement reached by the parties. It provided as follows:

"IT IS FURTHER ORDERED, in accordance with the aforesaid Agreement of the parties, that this is a qualified Domestic Relations Order as defined in the Retirement Equity Act of 1984, as from time to time amended, and, in accordance therewith, the civil pension known as the FIRE AND POLICE EMPLOYEES RETIREMENT SYSTEM OF THE CITY OF BALTIMORE ... is the civil pension which is subject to this order. The participant in the pension is the Defendant/Counter–Plaintiff, EDMUND LUBINSKI ... The alternate payee is the Plaintiff/Counter–Defendant, EDNA J. VENAZI ... The Plaintiff/alternate payee's equitable interest in said pension is hereby declared to be fifty percent (50%) of the 'marital share' of said pension benefits, the marital share being that fraction of the benefit whose numerator shall be the number of months of the parties' marriage, during which benefits were being accumulated, up to and including January 18, 1990, which number is 306, and whose denominator shall be the total number of months during which benefits were accumulated prior to the time when the payment of such benefits shall commence. The Plaintiff/Counter–Defendant ... shall receive fifty percent (50%) of the aforesaid marital share *of any payments made from the pension to the participant,* including any death benefits, *if, as, and when, such payments are made.*"

(emphasis added).

Elmer Dennis and Catherine Dennis were divorced by a Judgment of Absolute Divorce entered on June 7, 1993. The judgment was apparently entered by the court without the

agreement of the parties.[1] The judgment contained a provision similar to that in the Lubinski judgment:

"AND IT IS FURTHER ORDERED, that this is a Qualified Domestic Relations Order as defined in the Retirement Equity Act of 1984, as amended from time to time, and in accordance therewith, the Civil Pension known as the Baltimore City Fire and Police Employees' Retirement System ... is the pension which is subject to this Order. The participant in the pension is the Plaintiff, Elmer Dennis, Jr. ... The alternate payee is the Defendant, Catherine J. Dennis ... The Defendant/Alternate Payee's equitable interest in said pension is hereby declared to be fifty percent (50%) of the 'marital share' of said pension benefit, the marital share being that fraction of the benefit whose numerator shall be the number of months of the parties' marriage during which benefits were being accumulated, which number is 345, and whose denominator shall be the total number of months during which benefits were accumulated prior to the time when the payment of such benefits shall commence. The Defendant, Catherine J. Dennis, shall receive fifty percent (50%) of the aforesaid marital share *of any payments made from the pension to the participant if, as, and when such payments are made.*"

(emphasis added).

Elmer Dennis began work at the Baltimore City Police Department on September 24, 1964, and Lubinski began work at the Department on January 24, 1963. Both began participation in the DROP on August 1, 1996, and ceased participation on July 31, 1999. Both continued to work at the Department after participating in the DROP, with Elmer

---

1. The record before us is not clear on the issue of whether the Dennis' divorce judgment was entered into with agreement by the parties. The judgment does not reference an agreement between the parties, and Catherine Dennis' deposition testimony is not clear on this issue. We need not resolve this issue, however, as the result is the same regardless. *See* § IV.B., fn. 6, *infra,* for discussion. As appellants' arguments have presupposed that the Dennis divorce judgment was a consent judgment, and appellees have not contested this, we shall assume it is also.

Dennis retiring on September 2, 2002, and Lubinski retiring on February 9, 2001.

The Retirement System notified appellants by letter dated January 20, 1999, that it intended to treat payments of their DROP benefits as subject to division between them and their spouses in accordance with the formula specified in their QDROs. In response, appellants, along with other Baltimore City police officers, filed a Complaint in the Circuit Court for Baltimore City, seeking injunctive relief. This Complaint, the subject of a previous appeal to this Court, *Brown v. Retirement System*, 375 Md. 661, 826 A.2d 525 (2003), set out the facts relating to this Complaint as follows:

"Petitioners filed in the Circuit Court for Baltimore City on June 29, 1999, a Complaint for Declaratory and/or Injunctive Relief, seeking a declaration that their benefits under the City's Deferred Retirement Option Plan ('DROP') are not marital property and should be disbursed solely to them. On April 19, 2000, petitioners filed an Amended Complaint for Declaratory and/or Injunctive Relief, joining their former spouses as necessary parties under Maryland Rule 2–211. Respondents argued that the Circuit Court lacked jurisdiction to determine marital property and that the ex-spouses were entitled to a share of petitioners' DROP benefits. Motions by both sides for summary judgment were denied."

\* \* \* \* \* \*

"In lieu of testimony, the Circuit Court received the parties' trial briefs, stipulations, and documentary evidence and heard oral argument in April 2001. Respondents asked for a dismissal of the amended complaint and a judgment that petitioners be required to pay DROP benefits to their former spouses in accordance with the orders in the divorce proceedings. In a written order issued April 11, 2001, the Circuit Court dismissed, with prejudice, the petitioners' complaint, but quixotically ordered the Retirement System to 'treat all DROP benefits as ordinary pension benefits for

the purposes of payments pursuant to the parties' Judgments of Divorce."

"Petitioners noted a timely appeal to the Court of Special Appeals. In an unreported opinion, that court affirmed the trial court's determination that the DROP should be treated as an ordinary pension benefit for the purposes of payments pursuant to the parties' judgments of divorce. The officers filed a petition for a writ of certiorari, and we granted the petition."

*Id.* at 665, 668–69, 826 A.2d at 527–30 (footnotes omitted). In *Brown,* we held that the Circuit Court erred in reaching the merits of the Complaint, as the petitioners had failed to exhaust their administrative remedies. *Id.* at 673–74, 826 A.2d at 532–33. Consequently, we vacated the judgment of the Court of Special Appeals, and remanded with instructions to vacate the lower court judgments and dismiss the case. *Id.* at 674–75, 826 A.2d at 533.

After our decision in *Brown,* appellants filed claims with the Fire and Police Employees' Retirement System Board of Trustees ("the Board"), challenging the Retirement System's treatment of their DROP benefits as subject to division under their QDROs. Pursuant to Article 22, § 41 of the Baltimore City Code (2000), a hearing was held on appellants' claims on August 28, 2003. The Board then denied their claims, concluding that "[t]he DROP benefit is an integral part of the [Retirement System] benefit scheme" and that appellants' "DROP accounts must be assigned to their ex-spouses under their deferred division divorce decrees."

Appellants then filed a Petition for a Writ of Mandamus and Complaint for Declaratory Relief and/or Petition for Judicial Review in the Circuit Court for Baltimore City. Appellants sought judicial review of the Board's decision pursuant to Md. Rule 7–202, a declaratory judgment that appellants' DROP benefits should be disbursed in full to appellants, and a writ of mandamus ordering the Board to so disburse their DROP benefits. After the appellee spouses intervened in the action, the parties filed cross-motions for summary judgment. Rul-

ing on these motions, the court declared that "the DROP is subject to the deferred division stated in the parties' Judgments of Divorce as a matter of law," affirmed the decision of the Board of Trustees of the Retirement System, and denied appellants' petition for a writ of mandamus.

The appellants then noted timely appeals to the Court of Special Appeals. We granted appellants' petition for a writ of certiorari prior to decision in the Court of Special Appeals. *Dennis v. Fire Retirement,* 387 Md. 465, 875 A.2d 769 (2005).

## II.

In *Brown,* we detailed the operation of the Retirement System and the DROP as follows:

"The Retirement System is a governmental pension plan offered by Baltimore City and is codified in Baltimore City Code (2000 Supp.) Article 22. The Retirement System provides several different types of benefits, including service retirement benefits, line-of-duty disability benefits, line-of-duty death benefits, ordinary disability benefits, and ordinary death benefits. Membership in the Retirement System is mandatory for all police employees as a condition of employment. § 31(1). The Retirement System is funded by the mandatory contributions of its members, by the contributions of Baltimore City, and by the System's investment earnings. All benefit-funding assets are held under the Retirement System's name and are managed by a Board of Trustees. The Board establishes rules and regulations for the administration of the Retirement System's funds and for the transaction of its business. § 33(g).

"The Retirement System was amended in 1996 to add the DROP, effective July 1, 1996. § 36B. Members with at least twenty years of service under the Retirement System may elect to participate in the DROP for a maximum of three years. Eligible members who do not participate in the DROP may either retire and collect pension benefits, or continue to work and accrue service credit which will be used to calculate their retirement income.

"The DROP consists of three components:

(1) An amount equal to the annual retirement allowance (or prorated annual retirement allowance for partial years) the member would have received if he had retired from service at that time and actually begun receiving his maximum retirement allowance;

(2) An amount equal to the mandatory contributions the member is required to make to the Retirement System for his retirement benefits; and,

(3) Interest at 8.25% compounded annually until the member actually retires.

§ 36B(d).

"All mandatory contributions to the DROP are paid to the Board and commingled with all other contributions to the Retirement System. No actual separate account is established, and no funds are segregated. The Retirement System is a tax-qualified plan under the Internal Revenue Code. *See* [I.R.C.] § 401(a) *et seq.* (2000). All DROP payments are reported to the IRS on Form 1099R as having been paid from the Retirement System.

 * * * * * *

"During the period of DROP participation, the Member's regular pension is 'frozen,' i.e., the Member will not acquire new service credit toward the regular pension. At the conclusion of the DROP period, the Member's regular service retirement benefit remains the same as when he or she entered the DROP. Various forms of additional service credits and a bonus accrual can be earned after participating in the DROP.

"Distribution of the DROP benefit depends on how and when the Member retires. If the Member elects an ordinary retirement, he or she may receive the DROP benefit as a lump sum or as part of the regular monthly annuity payment. No part of the DROP benefit is payable in the event of a line-of-duty disability or a line-of-duty death. In such cases, the Member or the qualifying beneficiary re-

ceives only the benefit otherwise payable under the Retirement System. § 36B(k) and (i)."

*Brown*, 375 Md. at 665–67, 826 A.2d at 528–29.[2]

The "various forms" of additional benefits that a Member can receive by staying in service after participating in the DROP are dependent upon how long the Member stays in service after participating in the DROP. If a Member retires or terminates services immediately after participating in the DROP, the Member is entitled to the "Basic DROP Retirement Benefit." § 36B(e). The Basic DROP benefit consists of three components: (1) the ordinary service retirement allowance the Member would have received if he had retired at the time he started participating in the DROP; (2) the amount in the Member's DROP account at the time of retirement; and (3) "the balance in the member's Annuity Savings Fund subaccount accumulated under subsection (c)." *Id.* The Annuity Savings Fund subaccount consists of the Member contributions to the Retirement System that are required under § 36(h) for Members who are not in the DROP and are earning service credit. § 36B(c)(1). DROP participants are required to make these payments while participating in the DROP even though they are not earning service credit, and the payments into the Annuity Savings Fund subaccount are credited with interest at the same rate as funds accumulated in the Member's DROP account. *Id.*

If a Member continues in service for less than eighteen months after ending participation in the DROP, then the Member is entitled to the "Intermediate DROP Retirement Benefit." § 36B(f). The intermediate benefit consists of the basic DROP benefit under § 36B(e), plus one main additional component. The intermediate benefit differs from the basic benefit because it also provides a Member "3.5% of the member's 'average final compensation' . . . for each year of service credit, not to exceed 18 months, earned by the member

---

**2.** Section references in this quotation and in the remainder of this section are to Baltimore City Code, Article 22 (2000), unless otherwise indicated.

through continuous employment immediately following the end of the DROP participation period." § 36B(f)(2).[3]

If a Member participates in the DROP and then continues in service for eighteen or more months afterwards before retiring, the Member is entitled to receive the "Full DROP retirement benefit." § 36B(g). The full DROP benefit provides the recipient with the same benefits as provided by the basic DROP benefit, plus two additional benefits. First, the recipient of the full benefit receives the full ordinary retirement benefit provided by § 34(b) for the years served after terminating participation in the DROP program. *See* § 36B(g)(1). Second, the Member receives "1.5% of the member's 'average final compensation' ... for each year of service credit, not to exceed 4 years, earned by the member through continuous employment immediately following the end of the DROP participation period." § 36B(g)(2).

### III.

Appellants argue before this Court that payments of DROP benefits are not subject to division under their QDROs because the QDROs fail to reference DROP benefits specifically. They urge us to apply the principles of contract interpretation to the QDROs. Appellants then argue that application of these principles leads to the conclusion they desire, because the DROP is a separate program that provides benefits distinct from the pension benefits payable from the Retirement

---

**3.** The "average final compensation" of a Member is defined in § 30(11) for Members retiring after July 1, 1988 as "the average annual compensation, pay or salary earnable by a member for the 18 consecutive months of service as an employee during which his earnable compensation was highest." Section 36B(f)(2) provides that compensation earned during the DROP participation period is considered in determining a Member's average final compensation under that subsection.

Section 36B(f)(3) also includes in the intermediate DROP benefit "2% of the member's 'average final compensation' for each year of service not already included" by the other provisions in § 36B(f). The statute gives as examples of service years that would be included under this provision "service [years] purchased or transferred to this system during or after the DROP participation period." *Id.*

System pension plan referenced in appellants' QDROs. This is confirmed, they argue, by the fact that the DROP program was not offered by the Retirement System until 1996, several years after the appellants' QDROs were entered. According to appellants, this fact shows that appellants and the appellee spouses could not have intended to provide for division of DROP benefit payments in their QDROs, which in turn shows that division of DROP benefits was not a term of their agreements as reflected in their QDROs.

Appellees argue that the appellants are mistaken in their claim that the DROP is a distinct program from the pension plan offered by the Retirement System. In support, they point to the facts that the statutory provisions governing the DROP program are included in the same section of the Baltimore City Code as the rest of the provisions governing the Retirement System, DROP benefit payments are paid out of the same Retirement System trust fund, DROP participants are required to make the same mandatory contributions to the Retirement System as other Retirement System Members, and finally, that the DROP is treated as part of the Retirement System's pension plan for federal tax purposes.

## IV.

■■ We conclude that the payments of DROP benefits from the Retirement System to the appellants are "payments from the [Retirement System] pension" within the meaning of the appellants' QDROs because of the particular function that QDROs play under the Internal Revenue Code and related federal statutory provisions. A court order entered in a divorce proceeding that orders the transfer of pension benefits from one spouse to another spouse must meet the federal statutory definition of a QDRO if the transfer is to be respected for federal tax purposes. When, as here, parties enter by consent into a divorce decree purporting to be a QDRO, a reasonable person in the position of the parties would intend the terms of the QDRO that are operative in the federal statutory definition of a QDRO to be used as these terms are used under the federal statute in order to fulfill the parties'

intended purpose of creating a QDRO. The operative language identifying the payments that are subject to division in the appellants' QDROs is such language, and hence, it should be constructed in the same way as under the Internal Revenue Code. Therefore, as the DROP benefit payments at issue in this case are payments from the Retirement System's pension plan identified in the QDROs for federal tax and pension purposes, they are subject to division according to the terms of the appellants' QDROs.

### A. Qualified Domestic Relations Orders

In *Rohrbeck v. Rohrbeck*, 318 Md. 28, 30–36, 566 A.2d 767, 768–71 (1989), we explained in detail the statutory genesis and function of QDROs. The provisions governing QDROs were adopted by Congress in the Retirement Equity Act of 1984 ("REA"), Pub.L. 98–397, 98 Stat. 1433 (1984). The QDRO provisions in the REA were enacted in response to the pension anti-alienation provisions added to the Internal Revenue Code and to Title 29 of the United States Code by the Employee Retirement Income Security Act of 1974 ("ERISA"), Pub.L. 93–406, 88 Stat. 829 (1974). These anti-alienation provisions require that "[e]ach pension plan shall provide that benefits provided under the plan may not be assigned or alienated." ERISA § 206(d)(1) (codified at 29 U.S.C. § 1056(d)(1)). They further provide that a pension plan is not a "qualified trust" under I.R.C. § 401 unless the plan "provides that benefits provided under the plan may not be assigned or alienated." ERISA § 1021(c) (codified at I.R.C. § 401(a)(13)(A)). In addition, ERISA contained an express provision preempting state laws relating to employee benefit plans. *See* ERISA § 514 (providing that ERISA provisions "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 4(a) and not exempt under section 4(b) of this title") (codified as amended at 29 U.S.C. § 1144(a)).

The anti-alienation provisions, coupled with the preemption provision, called into question the validity of state court orders entered in domestic relations proceedings transferring pension

benefits. In response, Congress amended the Internal Revenue Code and Title 29 to exempt QDROs from the anti-alienation provisions. *See* REA §§ 104, 204. As amended, the Internal Revenue Code and Title 29 provide that the anti-alienation provisions apply to domestic relations orders unless they are QDROs. *See* I.R.C. § 401(a)(13)(B); 29 U.S.C. § 1056(d)(3)(A). "Qualified domestic relations order" is defined in Title 29 [4] as follows:

"(i) the term 'qualified domestic relations order' means a domestic relations order—

(I) which creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan, and

(II) with respect to which the requirements of subparagraphs (C) and (D) are met"

29 U.S.C. § 1056(d)(3)(B).[5] Subparagraph (C) of 29 U.S.C. § 1056(d)(3) requires a QDRO to clearly specify four items:

"(i) the name and the last known mailing address (if any) of the participant and the name and mailing address of each alternate payee covered by the order,

---

**4.** The Internal Revenue Code contains similar provisions relating to QDROs, which differ only in their internal section cross-references. *See* I.R.C. § 414(p).

**5.** "Domestic relations order" is defined in Title 29 as follows:
"[T]he term 'domestic relations order' means any judgment, decree, or order (including approval of a property settlement agreement) which—
(I) relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of a participant, and
(II) is made pursuant to a State domestic relations law (including a community property law)."
29 U.S.C. § 1056(d)(3)(B)(ii); *see* I.R.C. § 414(p)(1)(B) (similar definition).
"Alternate payee" is defined as follows:
"The term 'alternate payee' means any spouse, former spouse, child, or other dependent of a participant who is recognized by a domestic relations order as having a right to receive all, or a portion of, the benefits payable under a plan with respect to such participant."
29 U.S.C. § 1056(d)(3)(K); I.R.C. § 414(p)(8).

(ii) the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined,

(iii) the number of payments or period to which such order applies, and

(iv) each plan to which such order applies."

29 U.S.C. § 1056(d)(3)(C); *see* I.R.C. § 414(p)(2) (imposing similar requirements). Subparagraph (D) of 29 U.S.C. § 1056(d)(3) further provides that a domestic relations order is a QDRO only if the order:

"(i) does not require a plan to provide any type or form of benefit, or any option, not otherwise provided under the plan,

(ii) does not require the plan to provide increased benefits (determined on the basis of actuarial value), and

(iii) does not require the payment of benefits to an alternate payee which are required to be paid to another alternate payee under another order previously determined to be a qualified domestic relations order."

29 U.S.C. § 1056(d)(3)(D); *see* I.R.C. § 414(p)(3) (imposing similar requirements).

As we explained in *Rohrbeck*, the QDRO provisions in Title 29 and the Internal Revenue Code impose requirements on pension plan administrators to ensure that pension benefits are transferred only in the event a valid QDRO is in effect. We stated as follows:

"The law requires each plan to establish 'reasonable procedures to determine the qualified status of domestic relations orders and to administer distributions under such qualified orders.' 29 U.S.C. § 1056(d)(3)(G)(ii); [I.R.C.] § 414(p)(6)(B). Upon receipt of a domestic relations order, the plan administrator must notify the participant and the alternate payee of the receipt of the order and the plan's procedures for determining its qualified status. The administrator has 'a reasonable period' of up to 18 months in which to determine that status and inform the parties of the

decision. *See* 29 U.S.C. § 1056(d)(3)(G)-(H); [I.R.C.] § 414(p)(6)-(7)."

*Rohrbeck,* 318 Md. at 35, 566 A.2d at 771.

The ultimate effect of Congress' adoption of the provisions relating to QDROs has been to make the QDRO "an order of high significance in State domestic relations practice." *Rohrbeck,* 318 Md. at 35, 566 A.2d at 771. This is so because it is the only mechanism for successfully causing pension benefits to be made payable to an alternate payee, as pension plan administrators "will refuse to implement the court's decision" if a state court attempts to transfer pension benefits via a nonqualified domestic relations order. *Id.* at 35-36, 566 A.2d at 771.

### B. Construction of the Parties' Qualified Domestic Relations Orders

We conclude with respect to both QDROs that the language at issue in the case *sub judice* should be given the meaning it has under the Internal Revenue Code and the regulations thereunder. We reach this conclusion by application of ordinary contract construction principles to the QDROs, and we apply such principles because the QDROs are provisions incorporated into the parties' divorce judgments, which are judgments entered into by consent.

Consent judgments are "agreements entered into by the parties which must be endorsed by the court." *Chernick v. Chernick,* 327 Md. 470, 478, 610 A.2d 770, 774 (1992). As such, "[t]hey have attributes of both contracts and judicial decrees." *Id.* (citing *Local 93, Int'l Ass'n of Firefighters v. City of Cleveland,* 478 U.S. 501, 519, 106 S.Ct. 3063, 3073, 92 L.Ed.2d 405 (1986)). As a judgment, it is enforceable as a judicial decree " 'subject to the rules generally applicable to other judgments and decrees.' " *Long v. State,* 371 Md. 72, 82–83, 807 A.2d 1, 7 (2002) (quoting *Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, 378, 112 S.Ct. 748, 757, 116 L.Ed.2d 867 (1992)). It does, however, reflect the agreement of the parties "pursuant to which they have relinquished the right to

litigate the controversy." *Id.* at 83, 807 A.2d 1, 807 A.2d at 7. Thus, we look to the parties' agreement as embodied in the judgment in order to interpret it. *Id.* at 83–84, 807 A.2d at 7– 8. In interpreting the parties' agreement as embodied in a consent judgment, we have applied the ordinary principles of contract construction. *See id.* at 84–85, 807 A.2d at 8–9; *Chernick,* 327 Md. at 478–81, 610 A.2d at 774–75.

Applying ordinary contract principles to the Dennis and Lubinski QDROs, we conclude that the plain language of the QDROs unambiguously provides that all payments from the Retirement System pension to the appellants are subject to division in accordance with the terms of the QDROs. We further conclude that, to the extent there is any question under the QDROs as to whether payments of DROP benefits are indeed payments from the Retirement System *pension,* the plain language of the QDROs unambiguously makes the scope of the pension benefits covered by the language of the QDROs coextensive with the scope of benefits offered by the Retirement System that are treated as pension benefits under the Internal Revenue Code.

■■■■ Under Maryland law, the interpretation of a con- tract, including the question of whether the language of a contract is ambiguous, is a question of law subject to *de novo* review. *Towson v. Conte,* 384 Md. 68, 78, 862 A.2d 941, 946 (2004). We have long adhered to the objective theory of contract interpretation, giving effect to the clear terms of agreements regardless of what the parties may have intended by those terms at the time of contract formation. *Id.* at 78, 862 A.2d at 946–47. Under the objective theory:

"A court construing an agreement under [the objective theory] must first determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated. In addition, when the language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed. In these circumstances, the true test of what is meant is not

what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant."

*General Motors Acceptance v. Daniels,* 303 Md. 254, 261, 492 A.2d 1306, 1310 (1985), *quoted in Conte,* 384 Md. at 78, 862 A.2d at 947.

The language of the Dennis and Lubinski QDROs expressly identifies "the pension" that is the subject of the orders as "the Civil Pension known as the Baltimore City Fire and Police Employees' Retirement System." The language of the QDROs also clearly indicates that the appellee spouses, as designated alternate payees, are entitled to the specified share of "any payments made from the pension to the participant . . . if, as, and when, such payments are made."

Further, the language of the QDROs clearly indicates that they are intended to be "Qualified Domestic Relations Order[s] as defined in the Retirement Equity Act of 1984." Under the definition of "Qualified Domestic Relations Order" adopted in the REA, a domestic relations order is a qualified domestic relations order only if it "clearly specifies . . . each *plan* to which such order applies." I.R.C. § 414(p)(2)(D) (emphasis added); 29 U.S.C. § 1056(d)(3)(C)(iv) (emphasis added). The QDROs meet this federal statutory requirement by specifying that they apply to "the Civil Pension known as the Baltimore City Fire and Police Employees' Retirement System." Given this denomination of the orders at issue as "Qualified Domestic Relations Orders," and the federal statutory requirement that the subject plan of a QDRO be clearly identified in the order, we conclude that a reasonable person in the position of the parties at the time the QDRO was entered would have intended this language to identify the "plan" to which the orders apply, as required by federal statute. Thus, applying the objective theory, we hold that the language identifying the pension plan that is the subject of the QDROs is to be given the meaning it has under the Internal Revenue Code.

Appellants, however, would have us ignore the clear language of the QDROs and look to the subjective understandings of the appellee spouses at the time the QDROs were issued to decide whether the DROP is part of "the Civil Pension known as the Baltimore City Fire and Police Employees' Retirement System" within the meaning of the QDROs. According to appellants, we should interpret this language to exclude the DROP from being part of the Retirement System pension plan, because the appellee spouses' deposition testimony reveals that they did not envision the Retirement System adopting a program like the DROP at the time their QDROs were entered. The objective theory of contract interpretation, however, does not permit such inquiry into the subjective intent of the parties in cases such as this where the contract terms are clear, because under the objective theory "the clear and unambiguous language of an agreement will not give away to what the parties thought that the agreement meant or intended it to mean." *Conte,* 384 Md. at 78, 862 A.2d at 947 (quoting *Daniels,* 303 Md. at 261, 492 A.2d at 1310).[6]

---

6. As we noted in § I, fn. 1, *supra,* it is unclear from the record whether the Dennis divorce judgment that included the QDRO was a consent judgment. As we also noted *supra,* the parties have assumed that it is, but even if it is not, we would still reach the same conclusion we have here about the interpretation of the Dennis QDRO. The relevant language in the Dennis QDRO and the Lubinski QDRO is the same; our conclusion that this *language* is clear and unambiguous would apply with equal force to the language in the Dennis QDRO regardless of whether the language was adopted at the behest of the parties or by the court. The language of a judgment not entered pursuant to an agreement reached by the parties is interpreted according to its plain meaning if the language of the judgment at issue is clear and unambiguous, just as the language of a consent judgment is. *See Jones v. Hubbard,* 356 Md. 513, 533–34, 740 A.2d 1004, 1015–16 (1999) (if language of decree judgment is plain and unambiguous, it is interpreted in accordance with "what a reasonable person in the position of the parties, or of the court, would have thought it meant)," depending on whether its terms were devised by the parties or by the court (quoting *Monticello v. Monticello,* 271 Md. 168, 173, 315 A.2d 520, 523 (1974), *cert. denied,* 419 U.S. 880, 95 S.Ct. 145, 42 L.Ed.2d 121 (1974)). Therefore, even if the Dennis QDRO was not entered into pursuant to agreement of the parties, we would still interpret it to subject DROP benefit payments to division in accordance with the terms of the Dennis

### C. The Treatment of the DROP under the Internal Revenue Code

We now turn to the question of whether the DROP is treated as part of the civil pension plan of the Retirement System under the Internal Revenue Code. Appellants argue that the DROP is a separate plan, and therefore not subject to the terms of the QDROs. This position does not hold up under scrutiny.

As discussed above, because ERISA provided that a pension plan is generally not a "qualified trust" under I.R.C. § 401 unless the plan provides for the nonassignability of benefits under the plan, Congress added the QDRO provisions to the federal statute to permit assignments of pension benefits in connection with the disposition of domestic disputes. A "qualified trust" is a trust that forms part of a pension, stock bonus, or profit-sharing plan that meets the qualification conditions of I.R.C. § 401(a). Tax qualification under § 401(a) entitles a pension plan and its beneficiaries to various tax advantages. Chief among these are that the pension trust itself is exempted from taxation, I.R.C. § 501(a), and that the employer contributions to the trust on behalf of the beneficiaries are not included in the gross income of the beneficiary in the year of the contribution, but are only taxable to the employee when distributed. *Compare* I.R.C. § 402(b)(1) (employer contributions to trust result in inclusions in gross income of employee in year of contribution if the trust is not qualified under I.R.C. § 401(a)) *with* I.R.C. § 83(e)(2) (exempting transfers to trusts qualified under I.R.C. § 401(a) from I.R.C. § 83(a), which makes transfers of property by an employer on behalf of an employee taxable to the employee); I.R.C. § 402(a) (amounts distributed to employee from qualified pension trust are taxable to employee in the year of distribution). Furthermore, under government pension plans [7] such as the Retirement

---

QDRO if the DROP is treated as part of the civil pension plan of the Retirement System under the Internal Revenue Code.

7. I.R.C. § 414(d) defines "government plan" as "a plan established and maintained for its employees by the Government of the United States,

System pension plan, if the plan designates a contribution as an employee contribution but "picks up" the contribution, it is treated as an employer contribution for federal tax purposes, I.R.C. § 414(h)(2), and hence is entitled to exclusion from the employee's gross income in the tax year of distribution. I.R.C. § 83(e)(2); Rev. Rul. 77–462. To "pick up" an employee contribution within the meaning of § 414(h)(2), the employer must "specify that the contributions ... are being paid by the employer in lieu of contributions by the employee," and "the employee must not be given the option of choosing to receive the contributions directly." Rev. Rul. 87–10.

The regulations under I.R.C. § 401 permit an employer to "request a determination letter as to its qualification under section 401." Treas. Reg. § 1.401–1(e). After implementing the DROP in 1996, the Retirement System sought such a determination from the IRS. The IRS then determined that the Retirement System pension plan, including the DROP, was a qualified pension plan under I.R.C. § 401(a).

 In the instant case, we find persuasive the IRS determination that the Retirement System pension plan, inclusive of the DROP provisions, is qualified under I.R.C. § 401(a). We believe that in a case like the instant case, where the resolution of an issue of Maryland law depends in part on the resolution of an issue of federal tax law, that an IRS determination such as the determination here under Treas. Reg. § 1.401–1(e) should be afforded a degree of deference similar to the deference we afford to the decisions of Maryland administrative agencies. The determination of the IRS that the Retirement System pension plan, inclusive of the DROP, is qualified under I.R.C. § 401(a) is a determination of a question of law. Hence, giving the IRS determination a degree of deference similar to that we would give it if it were the decision of a Maryland agency, we afford the IRS determina-

by the government of any state or political subdivision thereof, or by any agency or instrumentality of any of the foregoing."

tion some deference, as it is a conclusion of law concerning a statute administered by the agency that issued the decision. *See Schwartz v. DNR*, 385 Md. 534, 554, 870 A.2d 168, 180 (2005) (although our review of an agency determination of law is de novo, "[w]e frequently give weight to an agency's experience in interpretation of a statute that it administers"); *Board of Physician v. Banks*, 354 Md. 59, 69, 729 A.2d 376, 381 (1999) ("Even with regard to some legal issues, a degree of deference should often be accorded the position of the administrative agency. Thus, an administrative agency's interpretation and application of the statute which the agency administers should ordinarily be given considerable weight by reviewing courts.") This deference, of course, is not without limit. *See Schwartz*, 385 Md. at 554, 870 A.2d at 180 ("it is always within our prerogative to determine whether an agency's conclusions of law are correct, and to remedy them if wrong"). In the present case, however, appellants have offered no legal argument challenging the IRS determination that the Retirement System pension plan is a qualified plan under I.R.C. § 401(a). Therefore, in the absence of any reasons before us to question the legal conclusion of the IRS that the Retirement System pension plan is tax-qualified under I.R.C. § 401(a), we defer to it.

*JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY APPELLANTS.*