936 A.2d 400

**Peter Cormick HEARN**

v.

**Pamela HEARN.**

**No. 2761, Sept. Term, 2006.**

Court of Special Appeals of Maryland.

Nov. 30, 2007.

Karen Alegi (Donald E. Bozimski, Roger C. Simmons, Gordon & Simmons, LLC on the brief), Frederick, for appellant.

Michael J. McAuliffe (Ethridge, Quinn, McAuliffe, Rowan & Hartinger on the brief), Rockville, for appellee.

Argued before KRAUSER, MEREDITH and WILLIAM W. WENNER, (Retired, Specially Assigned), JJ.

MEREDITH, J.

This case arises from a post-divorce dispute between the parties, Peter C. Hearn, appellant, and Pamela Hearn, appellee, relative to terms upon which Mr. Hearn's federal pension benefits will be divided. Shortly after the divorce was finalized, the parties negotiated a qualified domestic relations order to distribute a portion of Mr. Hearn's federal pension to Mrs. Hearn when Mr. Hearn retires. Because Mr. Hearn's pension is from the federal government, the order directing the distribution is a Civil Service Retirement and Survivor

Annuity Benefits Order ("CSRS order"). On February 10, 2001, in accordance with the joint request of the parties, the Circuit Court for Frederick County entered a CSRS order that directed a portion of Mr. Hearn's retirement benefits be paid to Mrs. Hearn, using a calculation called a pro rata formula. By letter dated May 3, 2001, the Office of Personnel Management ("OPM") acknowledged receipt of the CSRS order, and advised the parties that the formula for calculating Mrs. Hearn's portion of the pension benefit would be applied to the gross amount of the benefit that Mr. Hearn would be entitled to receive, if, as and when he was to receive it.

On August 22, 2006, Mr. Hearn filed a motion requesting the circuit court to order that the pro rata formula in the CSRS order be applied to Mr. Hearn's *net* annuity, rather than the *gross* amount of the retirement benefit. Mrs. Hearn opposed this motion. On November 28, 2006, the circuit court held a hearing and denied Mr. Hearn's motion without taking any evidence or testimony. Mr. Hearn noted a timely appeal.

Mr. Hearn has raised the following questions:

(1) Did the circuit court err in ruling that the pro rata formula used in the CSRS order applies to the gross payment and not the net payment received?

(2) Did the circuit court err in denying Mr. Hearn's request without permitting him to present any evidence in support of his motion?

We conclude that the circuit court correctly ruled that the CSRS order, as entered, provides for Mrs. Hearn to receive a portion of the gross benefits. The applicable federal regulations conclusively resolve any possible ambiguity in that regard. If Mr. Hearn had alleged that the CSRS order, when interpreted pursuant to the federal regulations, was not in accordance with his unilateral understanding to the contrary, the parol evidence rule would preclude further consideration of his request for reformation. But Mr. Hearn alleged that he and Mrs. Hearn both intended the formula for division to apply to his net benefit, and, therefore, if the CSRS order is not interpreted to apply to his net benefit, then he and Mrs.

Hearn were mutually mistaken as to the legal effect of the agreed language. Because the parol evidence rule does not preclude evidence of a mutual mistake, Mr. Hearn's claim for reformation should have been addressed by the circuit court. But the circuit court failed to make any factual findings or otherwise address Mr. Hearn's contention that the language used in the consent order was based upon a mutual mistake as to its legal effect. Accordingly, we shall vacate the judgment of the circuit court and remand the case for further proceedings.

## Facts and Procedural History

Mr. and Mrs. Hearn were divorced in 1999. A detailed separation agreement, signed by the parties on September 15, 1999, was incorporated, but not merged, into the final divorce judgment entered on September 15, 1999. The separation agreement described how the pro rata formula for division of Mr. Hearn's pension benefits would be calculated, stating:

> Husband's interest in the pension shall be divided between the parties and Wife shall be designated as the Alternate Payee of Husband's benefits and shall receive her share if, as and when Husband receives his benefits. The amounts of Wife's portion shall be determined by multiplying the amount of each payment times Fifty percent (50%) of a fraction. The fraction shall be determined or designated as follows: the numerator shall be the number of years and months of the marriage during which contributions were made to the Plan through July 3, 1998 and the denominator shall be the total number of years and months of employment during which contributions were made to the Plan. The parties agree that this shall be deemed to be twenty-two years (22) and six (6) months is the numerator and the total number of years and months of employment credited toward retirement is the denominator. The parties agree that Husband's initial date of service with the United States Government for purposes of determining his retirement benefits is June 16, 1968.

Thereafter, the parties negotiated a proposed consent order to require OPM to divide Mr. Hearn's pension benefits in accordance with their separation agreement. The proposed CSRS order expressly indicated in the preamble that it was intended to carry out the parties' agreement regarding the pension as the parties had previously set forth in their separation agreement.

On February 10, 2001, the circuit court entered the jointly requested CSRS order that divided Mr. Hearn's federal pension benefits between the parties "pursuant to the provisions of 5 CFR Section 838.101, *et seq. . . .* " The CSRS order used the pro rata formula agreed upon by the parties in the separation agreement, quoted above, to calculate the amount of payment that Mrs. Hearn will receive when Mr. Hearn begins receiving retirement benefits. The CSRS order also stated:

> [N]otwithstanding any language in any other Order of this or any other Court to the contrary, and notwithstanding any contrary or inconsistent terms contained in the above mentioned [Separation] Agreement or in the Judgment of Absolute Divorce, the language contained in this Order shall govern the determination of the matters addressed herein. . . .

After being entered by the circuit court, the CSRS order was submitted to OPM. According to counsel for Mr. Hearn, OPM notified him (1) that OPM had accepted the Hearns' CSRS order for processing, and (2) that OPM would apply the pro rata formula to the gross payment due to be paid to Mr. Hearn at retirement rather than the net annuity. Counsel for Mrs. Hearn represented to the circuit court that the notice from OPM was dated May 3, 2001, but no copy of the notice appears in the record.

On August 22, 2006, Mr. Hearn filed a motion in the Circuit Court for Frederick County requesting that the court instruct OPM to enforce the CSRS order by applying the agreed fraction to Mr. Hearn's net annuity, rather than the gross amount of the retirement annuity. In the memorandum sub-

mitted in support of Mr. Hearn's motion, he asserted that the court's CSRS order

> was the result of a negotiation between the parties over division of all [marital] property. The parties discussed and agreed that Ms. Hearn's share of the retirement benefit would be calculated from the net annuity payment received by Mr. Hearn. The parties believed that this intention was expressed in the CSRS Order by using the phrase "retirement annuity benefit *payment* that the Employee may hereafter become entitled to *receive* from the CSRS ..."
> ... However, OPM has indicated that unless corrective language is received it will apply the prorata formula to the gross retirement annuity benefit. If OPM applies the formula in this fashion, it will not be carrying out the CSRS Order as the parties intended and will be an injustice to the parties.

Although the above allegations were not supported by any documentary evidence, the motion was supported by an affidavit of Mr. Hearn that stated, in pertinent part:

> 2. When the Civil Service Retirement and Survivor Annuity Benefits Order was drafted, it was discussed how the formula used to determine Ms. Hearn's payment was to be applied, and we agreed that it would be applied to the net payment that I received from CSRS.

> 3. I was informed and therefore believed that the language used in the order that was filed with the Court was sufficient to carry out this intention.

> 4. I have been informed by OPM that it intends to apply the formula to the gross retirement annuity benefit, and requires further order from this Court to apply the formula as the parties intended.

> 5. If OPM were to apply the formula to the gross retirement annuity benefit, then OPM would not be executing the order in the way that I and Ms. Hearn intended and agreed.

In opposition to Mr. Hearn's motion, Mrs. Hearn denied that any action by the circuit court was required to carry out

the intentions of the parties, and further asserted that all of her former husband's claims for relief with respect to the terms of CSRS order were barred by laches. The opposition was supported by an affidavit of Mrs. Hearn stating under oath that the CSRS order was in accordance with her intent:

2. The Order clearly establishes the Agreement between the parties. I have no recollection of "net" benefits even being discussed.

3. I always intended and expected to receive my marital share of the Defendant's gross pension.

The circuit court held a hearing on the motion on November 28, 2006. Counsel for Mr. Hearn recounted that the CSRS order was intended to comply with the separation agreement. Counsel related that:

The language of both the separation agreement and the [CSRS order] doesn't use the word gross. However, because of OPM's particular wording that they need in orders, because it didn't use the word net or a few other particular phrases, the default that OPM uses is ... gross[.][S]o because the word payment was used and not another phrase, OPM is defaulting to gross even though the parties didn't put gross in the order.

* * *

The language used in both the separation agreement and the [CSRS order] uses the words payment ... payment received by the employee. . . . The parties did not use the word gross, and to allow OPM to apply it that way ... is not correct. It's not applying it as the parties intended it to apply, as they negotiated it back in 2001.

At the conclusion of her opening argument on the motion, counsel for Mr. Hearn stated: "I would intend to call Mr. Hearn as a witness. . . ."

Arguing in opposition to the motion, Mrs. Hearn's attorney asserted that the court was obligated to apply the provisions of the Code of Federal Regulations, which provide that if a CSRS order does not specify that it is to apply to the net

benefit, OPM will apply the order to gross benefits. Noting that it appeared that counsel for Mr. Hearn intended to call Mr. Hearn as a witness, and that he "intends to state what he believed and what Ms. Hearn believed," Mrs. Hearn's counsel pointed out that Mrs. Hearn's affidavit disputed her former husband's recollection. Counsel for Mrs. Hearn protested, "it's inappropriate for [Mr. Hearn] to state in the affidavit or testify as to what she believed."

Without hearing any testimony from Mr. Hearn, the court denied Mr. Hearn's motion. The court noted that the order is not ambiguous because the regulations by which OPM administers CSRS orders make clear that the agreement was to apply to gross benefits. The court did not address Mr. Hearn's contention that the CSRS order did not conform to the mutual intention of the parties. As a consequence of the court's denial of the motion, it was not necessary for the court to consider Mrs. Hearn's claim of laches.

On November 29, 2006, the day after hearing on the motion, Mr. Hearn filed a "proffer in support of his motion." The proffer attached two letters exchanged between counsel prior to entry of the CSRS order, and stated:

> Defendant proffers that had he been allowed to offer evidence in support of his motion, he would have offered the attached letters in support of his motion. Attachment A [letter dated January 26, 2001, from wife's counsel to husband's counsel] and B [letter dated December 14, 2000, from husband's counsel to wife's counsel]. These letters evidence that the parties specifically eliminated the term "gross" from the calculation of the formula for Plaintiff's share of the pension benefit. These letters show that the interpretation of the Office of Personnel Management and the ruling of the Court are not consistent with the parties' drafting of the order.

The proffered letter from Mr. Hearn's counsel commented that the separation agreement specified that the pro rata formula was to be applied to "the amount of each payment," whereas the initial draft of the CSRS order stated that the

formula was to apply to "the gross annuity amount of each monthly retirement annuity payment. . . ." The letter concluded:

> Thus, while the [separation] agreement provides that your client's share will be taken from the amount of the payment itself, the proposal has the share coming off of the gross. If this can be rectified, I believe we will be able to agree to the proposal as submitted.

The proffered letter of response from counsel for Mrs. Hearn stated: "Enclosed please find the Civil Service Retirement and Survivor Annuity Benefits Order with your only requested change, stated in your letter attached."

In response to Mr. Hearn's post-hearing proffer, counsel for Mrs. Hearn moved to strike the proffered material, arguing that the letters would have been inadmissible because they predated the CSRS order and would have been irrelevant to interpretation of that document. The circuit court entered its written order denying Mr. Hearn's motion on January 11, 2007, and Mr. Hearn noted his timely appeal on February 1, 2007. On February 16, 2007, the circuit court entered an order granting the motion to strike Mr. Hearn's proffer.

## Standard of Review

"Consent judgments are 'agreements entered into by the parties which must be endorsed by the court.'" *Dennis v. Fire and Police Employees' Ret. Sys.*, 390 Md. 639, 655, 890 A.2d 737 (2006) (quoting *Chernick v. Chernick*, 327 Md. 470, 478, 610 A.2d 770 (1992)). They reflect the agreement of the parties "pursuant to which they have relinquished the right to litigate the controversy." *Dennis, supra*, 390 Md. at 655–56, 890 A.2d 737 (internal quotations and citations omitted). Accordingly, we look to the parties' agreement as embodied in the judgment to interpret the order. *Id.* at 656, 890 A.2d 737. In interpreting the parties' agreement as embodied in a consent judgment, we have applied the ordinary principles of contract construction. *Id.* Under Maryland law, the interpretation of a contract, including the question of whether the language of a contract is ambiguous, is a question of law

subject to *de novo* review. *Towson v. Conte,* 384 Md. 68, 78, 862 A.2d 941 (2004).

## Discussion

■ Parties to a contract are presumed to contract mindful of the existing law, and all applicable or relevant laws must be read into the agreement of the parties just as if expressly provided by them, except where a contrary intention is evident. As Judge Hammond wrote for the Court of Appeals in *Griffith v. Scheungrab,* 219 Md. 27, 33, 146 A.2d 864 (1959):

> It is familiar principle often applied in the cases that " * * * the laws which subsist at the time and place of making a contract enter into and form a part of it, as if they were expressly referred to or incorporated in its terms; and this rule embraces alike those which affect its validity, construction, discharge, and enforcement." *Brown v. Smart,* 69 Md. 320, 330, [14 A. 468]; *Globe Slicing Machine Co., Inc. v. Murphy,* 161 Md. 667, 671, 158 A. 26.

The Court of Appeals has on numerous occasions applied the principle of contract law that reads into agreements all existing and applicable laws and regulations. *See, e.g., Lema v. Bank of America, N.A.,* 375 Md. 625, 645, 826 A.2d 504 (2003) ("parties are presumed to know the law when entering into contracts ..."); *Auction & Estate Representatives, Inc. v. Ashton,* 354 Md. 333, 344, 731 A.2d 441 (1999) ("Maryland adheres to the general rule that parties to a contract are presumed to contract mindful of the existing law and that all applicable or relevant laws must be read into the agreement of the parties just as if expressly provided by them, except where a contrary intention is evident"); *Wright v. Commercial and Sav. Bank,* 297 Md. 148, 153, 464 A.2d 1080 (1983) (same); *Dennis v. The Mayor and City Council of Rockville,* 286 Md. 184, 189, 406 A.2d 284 (1979) ("the laws subsisting at the time of the making of a contract enter into and form a part thereof as if expressly referred to or incorporated in its terms, and the principle embraces alike those provisions which affect the validity, construction, discharge and enforcement of the contract"). In this case, the applicable federal regulations resolve

any ambiguity with respect to whether the CSRS order should be construed to apply to Mr. Hearn's gross annuity benefit.

5 C.F.R. § 838.101 governs the purpose and scope of court orders affecting retirement benefits. Specifically, that section

> regulates the Office of Personnel Management's handling of court orders affecting the Civil Service Retirement System (CSRS) or the Federal Employees Retirement System (FERS), both of which are administered by the Office of Personnel Management (OPM). Generally, OPM must comply with court orders, decrees, or court-approved property settlement agreements in connection with divorces, annulments of marriage, or legal separations of employees, Members, or retirees that award a portion of the former employee's or Member's retirement benefits or a survivor annuity to a former spouse.

5 C.F.R. § 838.101(a)(1). Section 838.101(b) prescribes

> (1) The requirements that a court order must meet to be acceptable for processing under this part; . . . (3) The procedures that OPM will follow in honoring court orders and in making payments to the former spouse or child abuse creditor; and (4) The effect of certain words and phrases commonly used in court orders affecting retirement benefits.

In *Pleasant v. Pleasant,* 97 Md.App. 711, 726 n. 8, 632 A.2d 202 (1993), this Court stated: "It is expected that, henceforth, when marital property includes a federal pension, the attorneys and the trial judge will have familiarized themselves with the information contained in 5 C.F.R. Part 838."

Part 838 of the Code of Federal Regulations addresses the requirements that a court order must meet to be acceptable for processing by the OPM. The regulations require the court order to specify the type of employee annuity to which the former spouse's share calculation should be applied. 5 C.F.R. § 838.306. Three classifications of annuity are defined. The self-only annuity means recurring unreduced payments under CSRS to a retiree with no survivor annuity payable to anyone.

The gross annuity is the self-only annuity less deductions for the cost of survivor annuity benefits, but before any other deductions. The net annuity is the gross annuity less other deductions, such as health and life insurance and taxes. 5 C.F.R. § 838.103. Most important for the purposes of this appeal is § 838.306, which reads:

(a) A court order directed at employee annuity that states the former spouse's share of employee annuity as a formula, percentage, or fraction is not a court order acceptable for processing unless OPM can determine the type of annuity on which to apply the formula, percentage, or fraction.

(b) The standard types of annuity to which OPM can apply the formula, percentage, or fraction are net annuity, gross annuity, or self-only annuity, which are defined in § 838.103. **Unless the court order otherwise directs, OPM will apply the formula, percentage, or fraction to gross annuity.** Section 838.625 contains information on other methods of describing these types of annuities.

(Emphasis added.) The latter cross-referenced regulation, 5 C.F.R. § 838.625, similarly states in subsection (c): "All court orders that do not specify net annuity or self-only annuity apply to gross annuity."

In the instant case, the parties included a provision in their proposed CSRS order regarding the division of Mr. Hearn's pension. As indicated, that portion of the order, which does not specify that it applies to net annuity or self-only annuity, reads:

Husband's interest in the pension shall be divided between the parties and Wife shall be designated as the Alternate Payee of Husband's benefits and shall receive her share if, as and when Husband receives his benefits. The amounts of Wife's portion shall be determined by multiplying the amount of **each payment** times Fifty percent (50%) of a fraction. The fraction shall be determined or designated as follows: the numerator shall be the number of years and months of the marriage during which contributions were made to the Plan through July 3, 1998 and the denominator

shall be the total number of years and months of employment during which contributions were made to the Plan. The parties agree that this shall be deemed to be twenty-two years (22) and six (6) months is the numerator and the total number of years and months of employment credited toward retirement is the denominator. The parties agree that Husband's initial date of service with the United States Government for purposes of determining his retirement benefits is June 16, 1968.

(Emphasis added.)

On its face, the order does not specify how "each payment" is to be calculated; that is, it does not state whether the "payment" to be multiplied by the pro rata formula is Mr. Hearn's gross annuity payment or his net annuity payment. While this might have created ambiguity in the absence of a governing legal provision, the Code of Federal Regulations deals explicitly with this scenario. "Unless the court order otherwise directs, OPM will apply the formula, percentage, or fraction to gross annuity." 5 C.F.R. § 838.306(b); *accord* 5 C.F.R. § 838.625(c). Here, the CSRS order did not state explicitly that the fraction would apply to Mr. Hearn's net annuity or self-only annuity. Accordingly, under the terms of 5 C.F.R. §§ 838.306(b) and 838.625(c), the fraction will be applied to Mr. Hearn's gross annuity. For the purpose of interpreting a contract, we presume that the parties knew the law, including the applicable federal regulations, when they negotiated the CSRS order. *See, e.g., Wright, supra,* 297 Md. at 153, 464 A.2d 1080; *Pleasant, supra,* 97 Md.App. at 726 n. 8, 632 A.2d 202.

Because 5 C.F.R. § 838.306(b) clearly governs the parties' CSRS order, there was no need for the circuit court to consider extrinsic evidence regarding the parties' subjective intent in order to resolve any ambiguity in the order's terms. The absence of a definition for the term "payment" in the CSRS order did not create an ambiguity because, under existing applicable law, OPM would apply the pro rata formula to the gross annuity pursuant to the default provision in 5 C.F.R. § 838.306(b). When the CSRS order is viewed as if

the governing federal regulations are part of the order, there simply is no ambiguity that the court needs to resolve by consideration of subjective intent.

But even an unambiguous contract could be reformed if it is the product of a mutual mistake. Mr. Hearn argues the circuit court should have permitted him to introduce evidence that OPM did not interpret the CSRS order "according to the intention of the parties." In essence, Mr. Hearn argues that there was a mutual mistake on the part of both parties who proposed the consent order, and the mutual mistake should be corrected by reformation of the CSRS order to conform with the actual intent of parties that the order apply to his net payment.

Mrs. Hearn responds (a) any mistake was unilateral, not mutual; and (b) a party's mistake of law does not provide any basis for relief. Although we reject Mrs. Hearn's contention that even a mutual mistake of law would not support a request for reformation, we agree with Mrs. Hearn that a unilateral mistake on the part of Mr. Hearn, whether of fact or law, would not provide a basis for the court to grant the relief requested. Because we are unable to discern from the record that the circuit court made any factual findings with respect to Mr. Hearn's allegation that the parties mutually intended the formula to apply to his net annuity, we shall remand the case for further proceedings.

The Court of Appeals noted in *Higgins v. Barnes*, 310 Md. 532, 538, 530 A.2d 724 (1987), that a claim for reformation based upon mutual mistake differs significantly from a claim that evidence of one party's intent should be admitted to explain an ambiguity:

A claim for reformation differs significantly from a claim that parol evidence is admissible to explain an ambiguity. The principles involved, and the standards of persuasion that must be met, are entirely different. Fraud, duress, or mutual mistake must be shown to justify a reformation, but are not involved in the question of the existence of an ambiguity in the contract. The burden of persuasion upon a

party seeking reformation of an instrument is significantly higher than the preponderance standard used to determine the existence of an ambiguity.

In 28 WILLISTON ON CONTRACTS § 70.135 at 13–14 (4th ed. Richard A. Lord), the commentator notes the conflict between the parol evidence rule and a claim for reformation based upon mutual mistake:

> The right of reformation, wherever allowed, is necessarily an invasion or limitation of the parol evidence rule because, when equity reforms a writing, it enforces an oral agreement at variance with the writing which the parties had agreed upon as a memorial of their bargain.

WILLISTON elaborates on the contrasting treatment of parol evidence:

> Where the written contract purports to cover the entire agreement of the parties, and there is no proof that anything was omitted or included by fraud, accident, or mistake, all prior and contemporaneous negotiations, representations, and verbal agreements are superseded by the written agreement, and extrinsic, parol evidence is inadmissible to alter, contradict, vary, add to, subtract from, modify, or supersede the written contract.

> \* \* \*

> Parol evidence is admissible to establish a claim for reformation of a written contract. One court opined: "Where parties have deliberately put their engagement into writing, in such terms as import a legal obligation without any uncertainty as to the object or extent of the engagement, it is conclusively presumed that the whole of the engagement of the parties and the extent and manner of their undertaking have been reduced to writing, and parol evidence is not permitted to vary or contradict the terms of such writing, or to substitute a new or a different contract for it.... It is equally well settled that mistake, fraud, surprise, and accident furnish exceptions to [this] otherwise universal doctrine.... Parol evidence may, therefore, in

proper mode and in proper limits, be admitted to vary written instruments, upon [such] grounds . . . ."
*Id.* at 15, 16–17 (footnote omitted).

■ Although we express no opinion as to whether the evidence proffered by Mr. Hearn will be sufficient to establish a mutual mistake relative to the parties' intention regarding the division of Mr. Hearn's pension benefits, we agree with Mr. Hearn's contention that it is within the power of a court of equity to revise a consent order to make it conform with the actual mutual intent of the parties.

■ As the Court of Appeals stated in *Hoffman v. Chapman*, 182 Md. 208, 210, 34 A.2d 438 (1943):

> It is a settled principle that a court of equity will reform a written instrument to make it conform to the real intention of the parties, when the evidence is so clear, strong and convincing as to leave no reasonable doubt that a mutual mistake was made in the instrument contrary to their agreement.

The Court noted in *Hoffman* that this principle is an exception to the "general rule of common law that parol evidence is inadmissible to vary or contradict the terms of a written instrument." *Id.* A court of equity refuses to exclude evidence under the parol evidence rule "whenever it is alleged that fraud, accident or mistake occurred in the making of the instrument. . . ." *Id.* The *Hoffman* Court quoted Justice Story's explanation of this exception to the parol evidence rule as follows:

> "A court of equity would be of little value," Justice Story said, "if it could suppress only positive frauds, and leave mutual mistakes, innocently made, to work intolerable mischiefs contrary to the intention of parties. It would be to allow an act, originating in innocence, to operate ultimately as a fraud by enabling the party, who receives the benefit of the mistake, to resist the claims of justice under the shelter of a rule framed to promote it. * * * We must, therefore, treat the cases in which equity affords relief, and allows parol evidence to vary and reform written contracts and

instruments, upon the ground of accident and mistake, as properly forming, like cases of fraud, exceptions to the general rule which excludes parol evidence, and as standing upon the same policy as the rule itself." 1 Story, Equity Jurisprudence, 12th Ed., secs. 155, 156.

*Id.* at 210–11, 34 A.2d 438. *Cf.* WILLISTON, *supra*, § 70:135 at 11–12, stating:

Parol evidence fuels the engine of equity as it hums along the way, deciding whether to stop at rescission or reformation, or to pass on through. Without parol evidence, equity would stall, and the parties would be compelled to stand by their agreements, regardless of how mistaken they may have been.

The *Hoffman* Court affirmed a decree that reformed a deed to conform to the real intention of the parties. But in *dicta*, the Court stated: "The general rule is accepted in Maryland that a mistake of law in the making of an agreement is not a ground for reformation. . . ." *Hoffman, supra*, 182 Md. at 213, 34 A.2d 438. Although Mrs. Hearn argues that such loose dicta is fatal to Mr. Hearn's claim for relief because he is arguing that the parties mutually intended their language to have a different legal effect, the correct rule of law is that even if the mutual mistake is one of law, a court of equity can act.

The Court of Appeals rejected the contention that a court of equity could not act upon a mutual mistake of law in *Godwin v. Conturbia*, 115 Md. 488, 80 A. 1016 (1911). At issue in that case was a clause in a trust instrument that addressed the settlor's power of revocation. It was argued that the plain language of the trust instrument limited the power of revocation to certain defined periods of time. The Court concluded that the evidence left no doubt that the parties to the instrument intended and understood at the time of execution that the settlor's power of revocation continued indefinitely. The Court of Appeals stated, *id.* at 495, 80 A. 1016:

If the deed does not reserve such a power, it is because the parties to the instrument have been mistaken in the selec-

tion of terms to express their agreement. In this aspect of the case a Court of equity can have no hesitation in granting appropriate relief. The principle is well settled that equity has jurisdiction to correct an agreement which by a mutual mistake in the statement of its terms fails to effectuate the real intention of the parties.

Rejecting the argument that the mistake in *Godwin* involved the legal significance of the agreed language rather than a scrivener's erroneous choice of words, the Court stated, *id.*:

It has been suggested on behalf of the appellant that this doctrine [permitting reformation to correct a mutual mistake] is not applicable here, because, as it is argued, a misapprehension as to the meaning of language which has been used by design and not by inadvertence constitutes a mistake of law from which the parties are not entitled to be relieved. This theory, in our judgment, is not available under the conditions here presented. The questions in this case arise from doubts entertained as to the meaning of a particular combination of words in the connection in which they are used, and not as to the legal effect of language whose ordinary import is free of difficulty.

After distinguishing two Maryland cases cited for the principle that a mistake of law would not support equitable relief— *Euler v. Schroeder,* 112 Md. 155, 76 A. 164 (1910); and *Gebb v. Rose,* 40 Md. 387 (1874)—the *Godwin* Court held that the case was controlled "by the general rule announced in *Dulany v. Rogers*" 50 Md. 524, 532–33 (1879). The *Godwin* Court, 115 Md. at 496–97, 80 A. 1016, quoted from *Dulany,* 50 Md. at 532–33, as follows:

"If parties enter into an agreement, and through an error in the reduction of it to writing the written agreement fails to express their real intentions or contains terms or stipulations contrary to their common intention, a Court of equity will correct and reform the instrument so as to make it conform to the intention of the parties."

The two Maryland cases distinguished by the Court in *Godwin—Euler* and *Gebb*—do not bar equitable relief if, in fact, the consent order entered in this case did not comport with the mutual intent of the parties. *Euler, supra,* 112 Md. 155, 76 A. 164, involved a unilateral mistake of law, for which the court refused to grant equitable relief. In *Gebb, supra,* 40 Md. 387, the parties had failed to comply with the statutory requirements for a valid deed, and the Court of Appeals held that even if the parties to the deed were mutually mistaken as to the effectiveness of the instrument, their unintended failure to meet the statutory requirements would not be a basis for a court of equity to enforce an unenforceable deed. *Cf. Kiser v. Lucas,* 170 Md. 486, 503, 185 A. 441 (1936) (holding that one beneficiary under a trust agreement cannot assert, to the detriment of another beneficiary, that the settlor acted under a mistake of law); *Gross v. Stone,* 173 Md. 653, 666, 197 A. 137 (1938) (" '[a] court of equity will not permit one party to take advantage of and enjoy the benefit of an ignorance or mistake of law by the other, which he knew of and did not correct.' " (quoting Pomeroy's Equity Jurisprudence 846)).

The *Godwin* result is consistent with the approach taken in RESTATEMENT (SECOND) OF CONTRACTS § 155 at 406 (1981), which provides that a contract may be reformed if there has been a mutual mistake regarding its legal effect, as follows:

Where a writing that evidences or embodies an agreement in whole or in part fails to express the agreement because of a mistake of both parties as to the contents or effect of the writing, the court may at the request of a party reform the writing to express the agreement, except to the extent that rights of third parties such as good faith purchasers for value will be unfairly affected.

Comment *a* to § 155 specifies: "If the parties are mistaken with respect to the legal effect of the language that they have used, the writing may be reformed to reflect the intended effect." *Id.* at 407. This rule is consistent with the Restatement's view that a mistaken belief regarding legal provisions is but one variety of mistake as to the facts. RESTATEMENT (SECOND) OF CONTRACTS § 151 cmt. b at 384 explains:

*Facts include law.* The rules stated in this Chapter do not draw the distinction that is sometimes made between "fact" and "law." They treat the law in existence at the time of the making of the contract as part of the total state of facts at that time. A party's erroneous belief with respect to the law, as found in statute, regulation, judicial decision, or elsewhere, or with respect to the legal consequences of his acts, may, therefore, come within these rules.

*See also* 2 E. ALLAN FARNSWORTH, FARNSWORTH ON CONTRACTS § 9.2 at 590 (3d ed. 2004) ("[T]he modern view is that the existing law is part of the state of facts at the time of agreement. Therefore, most courts will grant relief for [a mistake of law], as they would for any other mistake of fact").

Other legal commentators are in accord with the view that a mutual mistake of law may support a claim for reformation of an agreement. Professor Williston provides the commentary most apt for the purposes of this appeal when he writes that "reformation may be available where the parties were under no mistake as to the words of the writing, but they supposed that the legal outcome would be different." 27 WILLISTON, *supra,* § 70:128 at 623. Professor Corbin's treatise on contracts similarly explains:

> If by reason of a mistake of law, the legal effect of the words in which a contract or conveyance is expressed is different from that on which the parties were agreed, reformation is a proper remedy. . . . Reformation is not a proper remedy for the enforcement of terms to which the defendant never assented; it is a remedy the purpose of which is to make a mistaken writing conform to antecedent expressions on which the parties agreed.

3 ARTHUR LINTON CORBIN, CORBIN ON CONTRACTS: A COMPREHENSIVE TREATISE ON THE RULES OF CONTRACT LAW § 614 at 721–23 (1960).

Accordingly, we conclude that the circuit court should have addressed Mr. Hearn's contention that the CSRS order entered by the court at the request of the parties, and having the legal effect as provided by 5 C.F.R. § 838.306(b), failed to

reflect the mutual intent and understanding of both parties. Although Mr. Hearn's burden of proof is high, *see, e.g., Hubble v. Somerville,* 187 Md. 418, 422, 50 A.2d 565 (1947) (explaining that evidence of the mistake and the alleged modification must be most clear and convincing), findings of fact on this issue should be made in the first instance by the circuit court rather than the appellate court. On remand, the circuit court will have the opportunity to consider the evidence proffered by Mr. Hearn as to the subjective intentions of the parties, and the court will be able to make a finding as to whether the CSRS order was, at the time it was entered, at odds with the mutual understanding of the parties.

**THE JUDGMENT OF THE CIRCUIT COURT FOR FREDERICK COUNTY IS VACATED. CASE REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEE.**