REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2426

September Term, 2013

JASON PULLIAM

v.

JILL IRENE PULLIAM

Zarnoch,
Graeff,
Leahy,

JJ.

Opinion by Leahy, J.

Filed: April 29, 2015

Appellant Jason Pulliam is a law enforcement officer employed by the Maryland Transportation Authority Police Force. During divorce proceedings in the Circuit Court for Harford County, Appellant and his then-wife, Appellee Jill Irene Pulliam, agreed, as reflected in the consent judgment entered, that she would receive one half of the marital share of his Law Enforcement Officers' Pension System ("LEOPS") pension. The parties dispute whether, pursuant to the agreement and consent judgment, a voluntary Deferred Retirement Option Program ("DROP") benefit is part of Husband's pension plan and properly included in Wife's eligible domestic relations order ("EDRO"). The circuit court concluded that Husband's LEOPS pension plan encompassed the DROP benefits and entered the EDRO.

We hold that the parties' consent judgment was unambiguous and that DROP benefits are part of the LEOPS pension as a matter of law for purposes of the parties' EDRO. We affirm the judgment of the circuit court.

## BACKGROUND

Jason and Jill Pulliam were married on June 4, 2005, and one child was born during their marriage. On June 19, 2010, the parties separated, and ultimately filed for divorce in the Circuit Court for Harford County.[1] At the uncontested divorce hearing held on February 7, 2012, the parties, through their counsel, placed the settlement

---

[1]   On January 12, 2011, Appellee filed a complaint for limited divorce in the Circuit Court for Harford County. Appellant filed a counter-complaint for limited divorce on February 22, 2011. Thereafter, Appellant filed a supplemental counter-complaint for absolute divorce on July 21, 2011, and Appellee filed an amended and supplemental complaint for absolute divorce on August 25, 2011. Appellee filed a second Amended and Supplemental Complaint for Absolute Divorce on October 19, 2011.

1

agreement that they had reached on the record. Of particular relevance to this appeal, the agreement addressed Husband's membership in the LEOPS, in which he had been enrolled since November 1, 1997 through his employment at the Maryland Transportation Authority. The parties announced they had agreed that:

> Each party will retain [his or her] own 401-K retirement savings.
>
> Mr. Pulliam has a pension through his employer, a law enforcement pension. He will assign a portion of that to Mrs. Pulliam equal to one half, or 60 months, will be the marital share. She is entitled to one half of that portion of service.
>
> Mrs. Pulliam has, at her option and cost, to opt for survivor benefits at the time Mr. Pulliam retires.

Both parties accepted these terms on the record and affirmed their understanding that neither party could "come back and ask for a marital award or for the Court to adjust interest in marital property, or for the Court to take any action regarding property, other than to enforce the terms of this agreement."

On March 23, 2012, the court entered a judgment of absolute divorce. In its order, the court recognized that the parties had reached an agreement "as to all issues arising out of their marriage"; that this agreement had been read into the record; and that the judgment entered contained its terms. The judgment specifically addressed retirement benefits as follows:

> ORDERED, that each party shall retain as their sole and separate property their respective interest in and to their own 401K Plans; and it is further
>
> ORDERED, that the Defendant shall assign to the Plaintiff an interest in the Pension System for Law Enforcement Officers of the State of Maryland, as follows: **One half of the Marital Share of his entire**

2

**pension benefit.** The Marital Share is a fraction, the numerator of which is the number of months of the Participant's benefit credited service under the Plan during the parties' marriage, which the parties deem to be 60 months, and the denominator of which is the total number of months of the Participant's benefit credited service under the Plan. Plaintiff shall have the right, at her option, to request survivor benefits equal to her marital share provided she pays the cost of such benefits, and such benefits are available[.]

(Emphasis added).

On August 21, 2013, Wife filed a motion requesting that the circuit court enter an EDRO because Husband had refused to sign the order she had prepared, which specifically addressed the DROP benefits as part of Husband's pension. Accordingly, Husband filed an opposition on September 11, 2013, asserting that the proposed EDRO contained a provision directing that DROP payments were to be included in calculating the marital share, and emphasizing that he was not even eligible to participate in the DROP at the time. On January 17, 2014, the court issued an order and accompanying memorandum opinion granting Wife's motion and entering her proposed EDRO. In its opinion, the court framed the issue as "whether a particular retirement asset known as a DROP was or should be included in the Defendant's retirement assets." To resolve this issue, the Court relied on *Dennis v. Fire & Police Employees Retirement System*, 390 Md. 639 (2006), which the court found to "completely address[]" the issue. The court adopted the Court of Appeals's conclusion in *Dennis*, *id.* at 656, that the DROP payments were to be considered retirement assets within the meaning of the EDRO.[2] The court noted that

_____

[2] In its opinion, the circuit court refers to the requested EDRO as a "qualified domestic relations order," or a QDRO. Although both EDROs and QDROs serve the
(continued . . . )

3

same purpose, EDROs involve benefits from the Maryland State Retirement and Pension System and are governed by the Code of Maryland Regulations ("COMAR") 22.01.03.03, whereas QDROs are governed by the Employment Retirement Income Security Act of 1974 ("ERISA"). Use of the term "QDRO" in lieu of "EDRO" or other acronyms for similar orders, though technically inaccurate, has become recurrent:

> [A]lthough the [QDRO] concept and acronym are creatures of ERISA, the label "QDRO" may have achieved a broader meaning. As is often the case with a living language, the term has sometimes leapt the boundaries of its formal meaning to encompass generically orders in divorces that distribute retirement plan benefits, much as "xerox copy" became a synonym for "photocopy" regardless of the machine used to produce it, and the verb "google" has come to mean searching the Internet regardless of the search engine being used.

*Robinette v. Hunsecker*, 439 Md. 243, 247 (2014). The acquired broader meaning of the QDRO is understandable given its history.

In 1974, Congress enacted ERISA, which sought to "provide better protection for beneficiaries of employee pension and welfare benefit plans abounding in the private workplace." *Rohrbeck v. Rohrbeck*, 318 Md. 28, 30 (1989). One of the provisions "preclude[ed] plan participants from assigning or alienating their benefits under pension plans subject to the Act." The Act provided that this anti-alienation provision, subject to exceptions, "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan [subject to the ERISA requirements.]" *Id.* at 31 (internal quotation marks omitted). This prompted uncertainty regarding the validity of orders entered in State domestic relations proceedings assigning pension benefits to a person other than the plan beneficiary. *Id.* at 32. Congress resolved this concern in the Retirement Equity Act of 1984 ("REA") by clarifying that the anti-alienation provision applied to domestic relations orders except where they are deemed to satisfy certain requirements for QDROs as set out in the REA. *Id.* at 34-35 (citing REA §§ 104, 204).

The Court of Appeals recognized the distinction between a QDRO and similar domestic relations orders in *Robinette*, 439 Md. at 247. The Court noted that because not all retirement plans—*i.e.* government-sponsored plans—are subject to ERISA, courts use orders "similar to QDROs" to allocate retirement benefits between divorcing spouses. *Id.* (citing 29 U.S.C. § 1003(b)(1) and C. Callahan & T.C. Ries, Fader's Maryland Family Law (5th ed. 2012), § 12-3[c]). Thus, despite their functional similarity, the difference between an EDRO and a QDRO is important when determining which order to file. For example, COMAR 22.01.03.03(b)(11),(12) requires the order to be titled "Eligible Domestic Relations Order" and that the order not reference QDROs or ERISA. Nevertheless, an EDRO must comply with federal law governing QDROs for tax purposes. *See* COMAR 22.01.03.10(C) ("For the limited purpose of minimum (continued . . . )

in the case under consideration, "the intention of the court in incorporating the agreement of the parties was that all retirement assets be divided pursuant to the formula set by the parties."

The signed and filed EDRO provided, *inter alia*, that the "Alternate Payee's [Wife's] share of the Participant's [Husband's] allowance, including any DROP payment not otherwise restricted under the terms of the Participant's plan, shall be an amount that shall be computed by multiplying Participant's Basic Allowance by Fifty Percent (50%) multiplied by the 'marital share fraction.'"[3] "The 'marital share fraction' is the following fraction: the numerator is 60 months and the denominator is the total number of months of Participant's service credit in the [State Retirement and Pension System of Maryland]." In the event of Husband's untimely death, the EDRO also established (1) that Wife would receive a marital share of any pre-retirement death benefit so long as Husband was not survived by a spouse or minor child and wife, in fact, survives Husband; (2) that if Husband is married at the time of retirement, his surviving spouse would receive any post-retirement survivor benefits, and if Husband was not re-married, he could not elect any optional form of post-retirement survivor benefits; and (3) that if Husband is not survived by a spouse, minor child, or otherwise restricted by his plan,

distributions, taxation, and rollovers, benefits payable pursuant to an [EDRO] shall be subject to and shall comply with 26 U.S.C. §414(p)[,]" which establishes the requirements for QDROs).

[3] The EDRO also prohibited Husband from "diminish[ing] the benefits to be provided to the Alternate Payee or in any way tak[ing] any action which would adversely affect the Alternate Payee's Share nor omit[ting] to take any action required for the Alternate Payee to receive Alternate Payee's Share."

Wife would receive the marital share of Husband's DROP in the event of Husband's death before his participation in the DROP has concluded. Husband filed a timely appeal on February 4, 2014. Additional facts will be discussed below as relevant to our resolution of the issues.

## DISCUSSION

Appellant raises one question, which we have rephrased for review:

> Did the circuit court err when it ordered that Appellant's future potential DROP benefits should be included as part of his retirement assets to be distributed to Appellee under an EDRO pursuant to the agreement of the parties?

This question, raising issues concerning both the interpretation of the parties' consent judgment and a question of law regarding the DROP, are subject to *de novo* review by this Court. *See Dennis, supra,* 390 Md. at 656; *Schisler v. State*, 394 Md. 519, 535 (2006) ("[W]here an order involves an interpretation and application of Maryland constitutional, statutory or case law, our Court must determine whether the trial court's conclusions are 'legally correct' under a *de novo* standard of review.").

### A.

### Interpretation of the Consent Judgment

Generally, a court granting "a divorce has authority to determine which property is marital property, to assess its value, to order the transfer of ownership of certain categories of property, and to grant a monetary award to adjust 'the equities and rights of the parties.'" *Robinette v. Hunsecker*, 439 Md. 243, 245-46 (2014) (citing Maryland Code, Family Law Article ("FL") §§ 8-201 to -205 and *Conteh v. Conteh*, 392 Md. 436,

6

437 (2006)). "Among the property rights that may be allocated as part of such a proceeding is a spouse's interest in a retirement plan earned during the course of the marriage." *Id.* at 246 (citing *Deering v. Deering,* 292 Md. 115 (1981)). The court has the statutory authority to transfer ownership of an interest in pension and retirement benefits deemed to be marital property. Md. Code (1984, 2012 Rep. Vol.), FL § 8-205(a)(2)(i). "[I]n lieu of these judicial determinations, a divorcing couple may enter into an agreement for the allocation of their property, including retirement plan benefits." *Robinette*, 439 Md. at 246 (citing FL § 8-101).

In the instant case, the parties proceeded via the latter route by reaching a settlement agreement. At the February 7, 2012, hearing, the parties placed this agreement on the record, providing that "Mr. Pulliam has a pension through his employer, a law enforcement pension. He will assign a portion of that to Mrs. Pulliam equal to one half, or 60 months, will be the marital share. She is entitled to one half of that portion of service." The Judgment of Absolute Divorce entered on March 23, 2012 incorporated this agreement and provided that Appellee would receive "[o]ne half of the Marital Share of his entire pension benefit."[4] The pension benefit was specifically identified as the "Pension System for Law Enforcement Officers of the State of Maryland." The instant dispute arose because the parties debate the meaning of "pension"; namely, whether the

---

[4]      The Appellant did not seek to modify the wording of the Judgment of Divorce. We highlight this fact in light of Appellant's emphasis on the difference between the agreement placed on the record (half of the marital share of his "pension plan") and the judgment of divorce (half of the marital share of his **entire** pension plan") in his briefing on appeal.

pension includes DROP benefits or whether Appellee was required to specifically negotiate for them.

In Maryland, consent judgments entered into by the parties and endorsed by a court "have attributes of both contracts and judicial decrees." *Dennis*, *supra*, 390 Md. at 655 (citing *Chernick v. Chernick*, 327 Md. 470, 478 (1992)). To interpret provisions in a consent judgment, we apply the ordinary principles of contract construction. *Id.* at 656. To this end, we apply the objective theory of contract interpretation, wherein "the clear and unambiguous language of an agreement will not give way to what the parties thought the agreement meant or was intended to mean." *Atl. Contracting & Material Co. v. Ulico Cas. Co.*, 380 Md. 285, 301 (2004) (citations omitted). In applying the objective theory:

> A court . . . must first determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated. In addition, when the language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed. In these circumstances, the true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant.

*Gen. Motors Acceptance Corp. v. Daniels*, 303 Md. 254, 261 (1985). A "contract is ambiguous if it is subject to more than one interpretation when read by a reasonably prudent person." *Sy-Lene of Washington, Inc. v. Starwood Urban Retail II, LLC*, 376 Md. 157, 167 (2003). But it is not ambiguous "merely because the parties thereto cannot agree as to its proper interpretation." *Fultz v. Shaffer*, 111 Md. App. 278, 299 (1996). As noted, "[u]nder Maryland law, the interpretation of a contract, including the question of whether the language of a contract is ambiguous, is a question of law subject to *de novo*

8

review." *Dennis, supra,* 390 Md. at 656 (citing *Towson v. Conte,* 384 Md. 68, 78 (2004)).

We cannot ascertain any ambiguity in the portion of the consent judgment under contention in this case. A reasonable person in the parties' position would read the language to mean exactly what it says: "that the Defendant [Appellant] shall assign to the Plaintiff [Appellee] an interest in the Pension System for Law Enforcement Officers of the State of Maryland, as follows: One half of the Marital Share of his entire pension benefit." A reasonable person would also intend the word "pension" to encompass whatever benefits are included in that pension—the Pension System for Law Enforcement Officers—under applicable law. Appellant argues that Appellee could not have intended to include DROP benefits in their settlement agreement, because at that time, he was not participating in nor was he eligible for the DROP. That the parties disagree as to what was intended or what is legally included in that pension does not make the language ambiguous; instead, the issue becomes whether the DROP benefits are included in the Law Enforcement Officers' Pension System Retirement Plan as a matter of law.

## B.

## The DROP

Title 26 of the Maryland Code (1993, 2009 Repl. Vol. & 2013 Supp.), State Personnel & Pensions Article[5] governs the LEOPS.[6] The traditional path to retirement

---

[5] All statutory references are hereinafter to the State Personnel & Pensions Article.

[6] The pensions afforded to members of LEOPS are funded by both employer (continued . . . )

9

for an LEOPS member who has either 25 years of eligibility service or is at least 50 years old is to terminate his or her employment, at which time the member would begin receiving his or her "normal service retirement allowance." § 26-401(a). The normal service retirement allowance "equals the number of years of the member's creditable service[7] multiplied by 2% of the member's average final compensation[,]" so long as that amount does not exceed 60% of the member's final average compensation.[8] § 26-401(b)(1)-(2).

There is, however, an alternative route to retirement: a member may choose to participate, if eligible, in the voluntary Deferred Retirement Option Program, a program established in 2000. A member "is eligible to participate in the DROP if the member has at least 25 and less than 30 years of creditable service." § 26-401.1(c)(2). The member may elect to participate in the program for the *lesser* of five years; the difference between 30 years of service and the member's creditable service upon election to participate; or a

_____

contributions, *see* §§ 21-304 to -310, and member contributions, §§ 21-312 to -315.

[7]    "Creditable service" is defined as "the service credit of a member that is recognized for computing a benefit." § 20-101(m).

[8]    To visualize the calculation, the Maryland State Retirement and Pension System Benefits Handbook provides the following formula: ".02 x [Average Final Compensation] x Years of Service (up to 30 years) = Annual Basic Allowance." This number is then divided by twelve to determine the monthly retirement allowance. Md. State Ret. & Pension Sys., *Pension System for Law Enforcement Officers of the State of Maryland Benefits Handbook*, at 26 (2011), *available at* http://www.sra.state.md.us/Participants/Members/Downloads/Handbooks/BenefitHandbo ok-LEO.pdf & http://perma.cc/MC6F-JBJU [hereinafter *LEOPS Benefits Handbook*]. "'Average final compensation' means the average annual earnable compensation that is computed as provided in § 20-204 [governing retirement systems] or § 20-205 [governing pension systems]." § 20-101(g).

term selected by the member. § 26-401.1(d)(2). In other words, a member may participate in the DROP for a maximum of five years. When the member's participation in the DROP commences, the Board of Trustees of the Retirement and Pension System ("the Board") must begin to:

> (i)     deposit the DROP member's *normal service retirement allowance* [as calculated under § 26-401(b)] in the DROP for the DROP member's benefit;
>
> (ii)     adjust the DROP member's normal service retirement allowance each fiscal year [pursuant to the cost-of-living adjustments] as provided in §§ 29-401, 29-402, 29-406, and 29-408 of this article; [9] and
>
> (iii)     accrue interest on the amounts calculated under subparagraphs (i) and (ii) of this paragraph for the DROP member into the DROP at the rate of:
>
>> 1.   6% a year, compounded monthly if the individual is a DROP member on or before June 30, 2011; or
>>
>> 2.   4% a year, compounded annually, if the individual becomes a DROP member on or after July 1, 2011.

§ 26-401.1(h)(2) (emphasis added). The Board does not have to establish individual DROP accounts for each participating member. § 26-401.1(h)(6). During the period in which a member participates in the DROP, the member "may not receive creditable service or eligibility service." § 26-401.1(h)(3). Indeed, a DROP participant is considered "a retiree of the Law Enforcement Officers' Pension System." § 26-401.1(f)(2).

At the conclusion of the DROP period, the Board must "pay to the DROP member

---

9     Pursuant to these provisions, the retiree would also get cost of living adjustments even if he or she did not participate in the DROP.

11

or, if the DROP member has died, the designated beneficiary of the DROP member,[10] the amount accrued in the DROP for the DROP member . . ., reduced by any withholding taxes remitted to the Internal Revenue Service or other taxing authority, in a lump sum[,]" unless the DROP member directs the Board to transfer all or a portion of the DROP sum to a custodian of an eligible retirement plan. § 26-401.1(i)(1), (3). The amount of benefits available to the DROP member depends on a spectrum of factors: the amount of monthly retirement benefit deposited; the length of the member's participation in DROP; the amount and number of the cost-of-living adjustments applied to the account annually; and the amount of accumulated interest. The Board "shall commence and *continue* payment of the normal retirement allowance" to the member "as of the first day of the month following termination of a DROP member's participation in the DROP." § 26-401.1(j) (emphasis added). A DROP member must terminate employment at the conclusion of the DROP period.

Based on the foregoing provisions, we ascertain several features of the DROP statute that, together, are key to our analysis. First, a member is officially considered a "retiree" once he or she elects to participate in the DROP. § 26-401.1(f)(2). Second, the DROP benefit equals the member's *normal service retirement allowance*, calculated based on the number of service years and final compensation at the time the member begins to participate in the DROP. § 26-401.1(h)(2). The payment is deposited into an

---

[10]     A "designated beneficiary" to receive those funds may be the DROP member's surviving spouse or, if there is no surviving spouse, each child of the deceased who is under 18 years old, or, if there are no children, to the designated beneficiary in the paperwork filed with the Board. § 26-401.1(i)(2).

12

account during the member's participation in the DROP, accruing interest. Once the member's participation in the DROP ends, the statute instructs the Board to "*continue*" paying the same normal retirement allowance (with cost of living adjustments) directly to the member, rather than into the DROP account. § 26-401.1(j). Stated another way, from the time a member commences participation in the DROP to the time he or she terminates his or her employment and thereafter, the Board will be *continuously* paying the same retirement service allowance; those payments are first deposited into a DROP account and then are given to the member directly. Thus, sections 26-401.1(j) and (h)(2), when read together, reflect *another way* to begin receiving pension benefits via the DROP, not a *new type* of benefit. We reject Appellant's contention that the placement of the DROP payments into a separate account is material; this is an administrative function.

Third, by electing to participate in the DROP, the member stops accruing creditable service to be used for computing the pension payment. § 26-401.1(h)(3). Based on the statutory calculation of the basic allowance, which uses years of service and average final compensation as variables, the more years of service a member has, the higher his or her basic allowance will be. Conversely, all other things being equal, the fewer years of service a member has, the lower his or her basic allowance will be. By participating in the DROP, which halts the accrual of years of service, Appellant would therefore be lowering the number of years to be used for computing his basic allowance and, therefore, would be reducing his monthly basic allowance payments that he would receive—and Appellee would share in—upon termination of his employment. This "freeze" precludes a member from getting the double benefit of starting to accumulate

13

retirement benefits when still working and receiving his or her usual paycheck while simultaneously increasing the pension benefits upon termination of his or her employment by continuing to collect creditable service. Indeed, a member's choice to participate in the DROP and to receive the lump sum is made instead of receiving a higher monthly pension payment in the future, thereby impacting the entirety of the member's employment. *Cf. Balt. Cnty. v. Thiergartner*, __ Md. __, ___, Nos. 44 & 58, Sept. Term 2014, slip op. at 22 (filed April 20, 2015) (stating, in the context of Baltimore County's DROP system, that "[t]he lump sum is thus a benefit payment that relates to the entirety of the employee's retirement and not simply to the particular date on which it happens to be paid"). In addition, that the money in the DROP account accumulates interest during the member's participation in the program does not render the underlying principal to be a separate benefit; instead, it may incentivize members to participate.

Together these features lead us to the conclusion that DROP benefits are part of the overall pension for purposes of the parties' EDRO. The regulations promulgated by the State Retirement and Pension System to specifically address domestic relations orders support this conclusion. Pursuant to COMAR 12.01.03.03(B)(2), an EDRO must "create[] or recognize[] the right of the alternate payee to receive all or a portion of the participant's plan benefit if, when, and as paid by the Board of Trustees." A "plan benefit," unless otherwise stated in an EDRO, means "an amount payable by the Board of Trustees to a participant," such as an allowance. COMAR 22.01.03.02(B)(10)(a)(i). An allowance includes "a lump sum payment of the amount accrued in the Deferred Retirement Option Program on termination of the participation." COMAR

14

22.01.03.02(B)(2)(b)(v). In other words, the regulations treat the DROP lump sum as a "plan benefit" that may be subject to division under an EDRO.[11]

Our reading of the DROP statute and attendant regulations is consistent with the Court of Appeals's opinion in *Dennis*, on which the circuit court correctly relied in its final decision underlying this appeal.[12] The *Dennis* case involved two Baltimore City police officers, Edmund Lubinski and Elmer Dennis, who had civil pensions under what is known as the Baltimore City Fire and Police Employees' Retirement System ("Retirement System"). 390 Md. at 642. Both officers were divorced from their respective wives, Edna Sullivan and Catherine Dennis. *Id.* at 643. The Judgment of Absolute Divorce for Lubinski and Sullivan, dated February 22, 1990, was based on an agreement reached by the parties. The Judgment stated that Sullivan's "equitable interest in [Lubinski's Fire and Police Employees Retirement System of the City of Baltimore] is . . . fifty percent (50%) of the 'marital share' of said pension benefits" and established that Sullivan "shall receive fifty-percent (50%) of the aforesaid marital share of any

---

[11]     As will be discussed *infra*, however, the regulations treat the "survivor benefits" provision of the DROP statute differently.

[12]     The *Dennis* case, along with its companion case *Brown v. Fire & Police Employees' Ret. Sys.*, 375 Md. 661 (2003), appear to be the only Court of Appeals opinions addressing the DROP in this context. Recently, however, the Court of Appeals addressed Baltimore County's version of DROP in the context of whether the DROP sum is included in the formula for capping workers' compensation benefits. *See Balt. Cnty. v. Thiergartner*, __ Md. __, ___, Nos. 44 & 58, Sept. Term 2014, slip op. at 2 (filed April 20, 2015) (holding that the statute imposing the cap on weekly workers' compensation benefits contemplates a comparison of payments paid on different time schedules and that the DROP sum must be converted to a weekly number to apply the workers' compensation formula).

15

payments made from the pension to the participant, including death benefits, if, as, and when, such payments are made." *Id.* (emphasis omitted). Similar language was contained in the Judgment of Absolute Divorce for Elmer Dennis and Edna Dennis dated June 7, 1993. *Id.* at 644. QDROs were issued in both cases.[13]

Thereafter, both officers enrolled in the City's DROP (similar to the State's LEOPS DROP plan) on August 1, 1996 and ceased participation on July 31, 1999. Upon their retirement, the Retirement System notified both officers that the DROP payments would be subject to the QDROs and disbursed accordingly to their former wives. After pursuing their administrative remedies, which resulted in a denial of their challenges to the DROP distributions,[14] the officers filed a petition for writ of mandamus and complaint for declaratory relief and/or petition for judicial review with the Circuit Court for Baltimore City. *Id.* at 646. The circuit court, affirming the administrative agency, ruled as a matter of law that the DROP is subject to the deferred division in the Judgments of Divorce. *Id.* at 646-47. Granting certiorari before this Court addressed the appeal, the Court of Appeals affirmed.

On appeal, the officers contended that the QDROs did not require division of the

---

[13] We note that in *Robinette, supra*, in reviewing the broadened use of the term "QDRO," the Court of Appeals cited *Dennis* as an example of when Maryland courts have used the term "QDRO," which is subject to ERISA, even though the plan at issue—the Baltimore City pension plan—is a government-sponsored retirement plan *exempt* from ERISA. 439 Md. at 247 & n.3.

[14] In the parties' first appeal, the Court of Appeals first concluded that the officers failed to exhaust their administrative remedies before the Fire and Police Employees' Retirement System Board of Trustees and vacated and remanded the decision for the parties to exhaust their administrative remedies. *Brown v. Ret. Sys.*, 375 Md. 661 (2003).

DROP benefits "because the QDROs fail[ed] to reference DROP benefits specifically" and that "the DROP is a separate program that provides benefits distinct from the pension benefits payable from the Retirement System pension plan[,]" particularly because the DROP did not exist at the time of divorce. *Id.* at 650-51. The former wives countered that the DROP benefits were paid out of the Retirement System trust; that DROP members must still contribute to the Retirement System Fund; and that "DROP is treated as part of the Retirement System's pension plan for federal tax purposes." *Id.* at 651.

The Court began by reviewing the Retirement System and the DROP as established by the Baltimore City Code. *Id.* at 647-50. Notably, the DROP involved in *Dennis* consisted of three components:

> (1) An amount equal to the annual retirement allowance (or prorated annual retirement allowance for partial years) the member would have received if he had retired from service at that time and actually begun receiving his maximum retirement allowance;

> (2) An amount equal to the mandatory contributions the member is required to make to the Retirement System for his retirement benefits; and,

> (3) Interest at 8.25% compounded annually until the member actually retires.

*Id.* at 648 (citation omitted). The Court also noted that the Retirement System is a "tax-qualified plan" under the Internal Revenue Code and that "[a]ll DROP payments are reported to the IRS on Form 1099R as having been paid from the retirement system." *Id.* (citation omitted).

The Court then concluded that, based on the unambiguous language in the QDROs, "all payments from the Retirement System pension to the appellants are subject

17

to division." To the extent that there was a dispute regarding whether the DROP benefits were payments from the pension system, the Court relied on the IRS's treatment of the DROP under the Internal Revenue Code. Because the IRS treats the Retirement System pension plan, *including the DROP*, as a qualified pension plan under the Internal Revenue Code, and without any argument to the contrary, the Court deferred to the IRS's determination and held that the DROP benefits were subject to division as part of the pension according to the terms of the officers' QDROs.[15] *Id.* at 660.

Appellant attempts to distinguish the instant case from *Dennis* on two main grounds. First, Appellant asserts that in *Dennis*, the officers had fully participated in the DROP at the time of the litigation, whereas here, Appellant is not eligible to and therefore has not elected to participate in the DROP, making DROP "future" and "potential" benefits and received well beyond the parties' marriage. Appellant fails to recognize, however, that although he was not yet eligible for the DROP at the time the parties separated, the five years of service accumulated during the parties' marriage contributes to his eligibility to participate in the DROP.[16] Indeed, Appellee would not be

---

[15] Neither party in the instant case focused on the tax status of the LEOPS in arguing whether the DROP benefits are part of Appellant's pension. However, the *Dennis* holding supports our interpretation of the LEOPS DROP statute, and without specifically deciding the issue, we note that the *Dennis* Retirement System plan and the LEOPS here are both government-sponsored plans, meaning that the LEOPS is likely also a tax-qualified plan under the Internal Revenue Code.

[16] Moreover, even non-vested pensions are subject to division as marital property. *See Deering v. Deering,* 292 Md. 115, 127-28 (1981) ("That a nonvested pension interest may be contingent upon continued employment does not 'degrade that right to an expectancy (because) (t)he law has long recognized that a contingent future interest is (continued . . . )

entitled to half of the DROP sum; she would only be entitled to one half of the *marital share* of that sum based on calculation set forth in the EDRO.

Second, Appellant claims that the *Dennis* Court relied on the fact that the DROP was not in existence at the time the wives negotiated their property rights, meaning that it could not be considered part of the Judgments of Divorce, whereas here, the DROP was in existence at the time of the parties' divorce, so Appellee could have negotiated for it. Although this is an accurate factual distinction between *Dennis* and the case *sub judice*, the Court of Appeals did not decide *Dennis* on that ground; its conclusion hinged on the IRS's treatment of the DROP, not that the DROP was not in existence at the time of divorce.

In sum, based on the applicable DROP statute and *Dennis*, we conclude that the DROP benefits are part of the LEOPS pension as a matter of law for purposes of the parties' EDRO and, therefore, are subject to division pursuant to the parties' consent judgment and accompanying EDRO.

## C.

### Survivor Benefits

Appellant also lodges a blanket argument that because survivor benefits are considered separate from the pension and must be negotiated separately, the DROP benefits should be treated similarly. We disagree.

LEOPS survivor benefits take two forms: "pre-retirement death benefits" and

property.'" (quoting with approval *In re Marriage of Brown*, 15 Cal.3d 838, 847 n.8 (1976) (en banc))).

19

"post-retirement survivor benefits." As to the first category, upon the pre-retirement death of a member (not involving willful negligence) who has more than two years of eligibility service, the Board must pay the allowance of 50% of the member's average final compensation in the following priority, depending on survivorship: the member's surviving spouse, children under the age of 18, or a dependent parent.[17] § 29-204(a). If the member is not survived by a spouse, minor child, or dependent parent, the death benefit goes to a designated beneficiary or, if none, to the member's estate. § 29-204(a)(2)(ii); § 29-202. As to the second category, upon the post-retirement death of a member, the Board must pay 50% of the retiree's retirement allowance to the surviving spouse (assuming the member, in the context of divorce, remarries either before or after retirement) or minor child. § 26-402. If a member is *unmarried* at the time of retirement, the member may elect to receive either his or her basic allowance or, alternatively, a reduced allowance in order to obtain one of the benefit options provided by § 21-402, which would be payable to a designated beneficiary. § 26-401(a)(1)-(2)(i).

Although similar to a pension, survivor benefits constitute marital property in their own right. *Potts v. Potts,* 142 Md. App. 448, 466 (2002). As a separate piece of marital property, "[a] spouse seeking to recover an interest in the survivor benefit attached to the other spouse's pension must request the survivor benefit in addition to any request for the pension benefit itself." *Whittington v. Whittington*, 172 Md. App. 317, 348 (2007). This

---

[17] If the member has at least one year of eligibility service, the Board shall pay an amount equal to the member's annual earnable compensation to a designated beneficiary, or, if there is none, to the member's estate. § 29-202(a).

20

rationale is sound, as survivor benefits address to whom the retirement payments will go in the event of the member's death, and a *former* spouse must negotiate to be the designated beneficiary in the LEOPS context in order to receive some portion of those benefits absent a surviving spouse, minor child, or dependent parent.

We find no similarity in the foregoing to the DROP benefits discussed in detail above, and Appellant does not otherwise articulate any resemblance. Unlike survivor benefits, which address *to whom* retirement payments will go in the event of death, the DROP simply provides an alternative avenue for the member *to begin receiving* the same basic allowance that the member would have received had he or she retired on the start date in the DROP.

In fact, the DROP statute even has its own "survivor benefits" provision, providing that if the DROP member has died, the Board shall pay the amount accrued in the member's DROP, *sans* taxes, to the designated beneficiary in the following priority, depending on survivorship: the DROP member's surviving spouse, all children under 18 years old, or a designated beneficiary. § 26-401.1(i)(1)-(2). The statute further provides that after the lump sum is distributed, if the DROP member has died before his or her participation in the DROP has concluded, the Board must proceed to pay the 50% of the normal service retirement allowance, including the cost-of living adjustments, pursuant to § 26-402. § 26-401.1(h)(2). These provisions are akin to the survivor-benefit provisions discussed above: that, if a member is not survived by a spouse or a minor child, the DROP lump sum may go to a designated beneficiary. *See also* COMAR 22.01.03.02(10)(c) (providing that a "plan benefit" subject to assignment to an alternative

21

payee via an EDRO does not include retirement death benefits or postretirement survivor benefits for which payment is restricted to a surviving spouse, minor child, or dependent parent, or the DROP amount for which payment is restricted to a surviving spouse or minor child). Therefore, in our view, that the DROP statute contains a provision similar to those applicable to basic pension payments afforded through the traditional retirement route supports our conclusion that the DROP and the pension are one in the same. Moreover, because the DROP has a "survivor benefits" provision, the DROP benefits as a whole cannot be akin to survivor benefits in their own right.

In the instant case, Appellee did, in fact, specifically negotiate for survivor benefits.[18] Regardless, we see no equivalence between DROP benefits and survivor benefits, and as a result, we see no error in the EDRO.

**JUDGMENT AFFIRMED;**
**COSTS TO BE PAID BY APPELLANT.**

---

[18] Appellant does not argue, and we see no reason to address otherwise, the proposition that Appellee was required to specifically negotiate rights to the "DROP survivor benefits" in addition to the two categories of survivor benefits for the pension.